UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- X
ERIN JOHNSON,                              :
                                           :
                        Plaintiff,         :
                                           :
            -v -                           :          16-CV-1805 (JPO)
                                           :
J. WALTER THOMPSON U.S.A., LLC, J.         :          OPINION AND ORDER
WALTER THOMPSON COMPANY LLC,               :
WPP PLC, and GUSTAVO MARTINEZ,             :
                                           :
                        Defendants.        :
-------------------------------------------------------- X
```

J. PAUL OETKEN, District Judge:

Plaintiff Erin Johnson filed this action against J. Walter Thompson U.S.A., LLC ("JWT USA"), J. Walter Thompson Company, LLC ("JWT Co.") (together, "JWT"), WPP PLC ("WPP"), and Gustavo Martinez (collectively, "Defendants") on March 10, 2016.  (*See* Dkt. No. 1.)  Johnson alleges that JWT and WPP discriminated and retaliated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* ("Title VII"), and that Defendants unlawfully discriminated and retaliated against her under New York State Human Rights Law, N.Y. Exec. Law § 296 *et seq.* ("NYSHRL" or "State Law"), and New York City Human Rights Law, Admin. Code of the City of N.Y. § 8-107 ("NYCHRL" or "City Law").  She also alleges retaliation for opposition to unlawful practices in violation of the Equal Pay Act, 29 U.S.C. 206(d) and 29 U.S.C. § 215(a)(3) ("EPA"), and Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  Defendants move to dismiss each claim under Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, their motions are denied.

## I.   Background

Unless otherwise noted, the following facts are taken from the Second Amended Complaint (Dkt. No. 62 ("Compl.")) and are assumed true for the purposes of this motion.

WPP is the world's "largest advertising company by revenue" and owns "a number of advertising, public relations, and market research firms," including JWT.  (Compl. ¶ 23.)  JWT is an international advertising agency with headquarters in New York.  (*Id.* ¶ 24.)

Johnson joined JWT in 2005 and rose quickly through the ranks, receiving "substantial pay increases, bonuses, and equity awards."  (*Id.* ¶¶ 27-28.)  Within two years, JWT promoted Johnson from Director of Corporate Communications for JWT New York to Director of Communications for JWT North America, (*id.* ¶¶ 28-29), and by 2009, she was promoted again to Chief Communications Officer of JWT, her current role (*id.* ¶¶ 13, 30).  Johnson's responsibilities include overseeing global internal and external communications, managing a core team of four employees, and overseeing JWT's regional communications and public relations teams around the world.  (*Id.* ¶ 30.)  In this new role, Johnson continued to succeed. She created and now leads JWT's Worldwide Communications/Public Relations Council; she developed and spearheaded important initiatives, including a blog, a digital talk show, and JWT's 150th anniversary celebration (*id.* ¶¶ 31-32); and she and her team have won multiple awards (*id.* ¶ 33).

When Johnson first assumed the position of Chief Communications Officer, she reported to former JWT Chairman and CEO, Bob Jeffrey.  (*Id.* ¶ 30.)  But on January 1, 2015, Defendant Gustavo Martinez succeeded Jeffrey as Worldwide Chairman and CEO.  (*Id.* ¶ 36.)  Martinez reported directly to WPP's CEO.  (*Id.*)

Johnson alleges that Martinez "made it impossible for her to do her job." (*Id.* ¶ 39.) Johnson's allegations are summarized here, in relevant part.

On May 18, 2015, just a few months into Martinez's tenure, at an off-site retreat in Miami, Martinez told a group of approximately sixty employees that he found the hotel where they were staying to be "tricky" and full of "strange characters" who made him "think[ ] [he] was going to be raped at the elevator . . . not in a nice way." (*Id.* ¶ 40.)

Approximately two days later, Johnson met with Martinez and told him that his comments about rape made her uncomfortable and were not acceptable.  Martinez responded that she "was wrong" and that "American women are too sensitive." (*Id.*  ¶ 42.)  Less than half an hour later, Martinez walked over to Johnson's desk, situated among other employees in an open-office layout, and told her—in front of "numerous" employees—to come to him so he could "rape [her]" in the bathroom.  (*Id.* ¶ 43 (alteration in original).)  Later that day, Martinez burst into a meeting of several female employees, including Johnson, and asked Johnson which female staff member he could rape.  (*Id.*)

Johnson alleges that these comments about rape and raping female employees at JWT were part of a broader pattern of conduct through which Martinez denigrated women through invocations of sex and rape.  Also in spring 2015, Martinez apparently told another employee that a certain female senior global executive needed to be "hogtied" and "raped into submission." (*Id.* ¶ 44.)  Johnson alleges that Martinez didn't like this woman because he believed that she is "too bossy" and "too American"; "she should shut up her mouth," he said.  (*Id.*)

Martinez repeatedly referenced sex and made sexualizing comments about women, including Johnson.  For example, following a conference call, Martinez asked a male business associate to leave his office because he and Johnson needed to talk about "the sex."  (*Id.*  ¶ 49.)

The associate laughed, and Martinez turned to Johnson, saying, "Come on, let's go talk about sex now . . . I am going to close the door." (*Id.*) He further made sexual comments about other female employees. In the course of a business meeting, Martinez invited a female JWT Director to present, calling her "young, willing, and ready." (*Id.* ¶ 52.) During the same meeting, he commented that he "loves sex" and loves to talk about it. (*Id.*)

Martinez also specifically commented on women's bodies. After Johnson's pregnancy, Martinez made a "snide remark" about her eating an appetizer at a work event; the comment implied that Johnson should eat less and should be more self-conscious about her weight. (*Id.* ¶ 53.) He also told Johnson and other women employees that he hated a female Director at JWT because she "smells bad" and he "hate[s] her hair." (*Id.* ¶ 54.) Martinez told the women employees not to repeat what he had said. (*Id.*)

Johnson also alleges that Martinez repeatedly said certain women were "too bossy." (*Id.* ¶ 51.) He specifically stated Johnson was "so bossy" and called Johnson his "bossy boss." (*Id.* ¶ 46.)

Martinez also physically touched Johnson. (*Id.* ¶¶ 45-48.) "He often rub[bed] her shoulders and stroke[d] her face." (*Id.* ¶ 45.) He has also "grabbed" her by the throat and the back of the neck multiple times, including when directing her to complete a task. (*Id.*) For example, in March 2015, Martinez grabbed Johnson by the back of the neck and, while laughing, exclaimed, "[she is] so bossy," in front of Johnson's colleagues. (*Id.* ¶ 46.) Martinez proceeded to shove Johnson toward his office. (*Id.*) In September 2015 and again in February 2016, Martinez took an apple Johnson was eating out of her hand, took a bite, and returned it to her. (*Id.* ¶¶ 47-48.) He indicated that she should keep eating the apple. (*Id.*)

Martinez made numerous comments about racial and religious minorities.  For example, he told Johnson and other JWT leaders (including CEOs and Presidents of various regional offices) that Latino customs officers had given him a hard time because he was from Spain; he said one of the agents had a "Guatemalan monkey face."  (*Id.* ¶ 56.)  Martinez told the group that he would avoid the "black monkeys" and "apes" at customs because they "don't know how to use computers"—he would seek out agents with blonde hair and blue eyes going forward.  (*Id.* ¶ 57.)  On multiple occasions, he made disparaging comments about Westchester because there are "too many Jews" and he "hate[s] those fucking Jews."  (*Id.* ¶¶ 59, 61, 62.)  In one instance, an employee brought to Martinez's attention that she is Jewish, and Martinez responded, "yes, but you are half Catholic."  (*Id.* ¶ 61.)  At one point, when disappointed that he had not been profiled in the press, Martinez complained that the "Jew" at a competing firm knew how to "work" the press better.  (*Id.* ¶ 63.)

Johnson raised concerns about Martinez's comments with the Chief Talent Officer, Laura Agostini.  (*Id.* ¶ 67.)  In mid-March 2015, Johnson met with Agostini to complain about Martinez's touching her.  (*Id.* ¶ 68.)  Agostini implied that the touching was not a problem because it was based on "affection."  (*Id.*)  Then in April, Johnson met with a public relations executive at WPP while on a business trip to London.  (*Id.* ¶ 69.)  She described Martinez's grabbing her by the throat, as well as his other conduct, and asked for advice about how to deal with this behavior.  (*Id.*)  The executive apparently responded that Johnson should not discuss her concerns with anyone at WPP and warned that she would be "exposed," her career would be adversely affected, and Martinez would "find out" if she continued to make complaints.  (*Id.*)

Around this time, Johnson alleges that Martinez "significantly cut" Johnson's bonus for the previous year.  (*Id.* ¶ 79.)  The bonus amount was "well below the level it had been since

2011." (*Id.*)  Johnson raised the bonus issue with Martinez "on multiple occasions" between April and May 2015.  (*Id.* ¶ 80.)  She asked whether "all of the men who reported to him in the corporate bonus pool also received significantly lower bonuses than they had received for the previous year," but Martinez refused to answer and responded that Johnson was "spoiled."  (*Id.*)

Martinez also stopped inviting Johnson to JWT Executive Committee meetings beginning after March 2015.[1]  (*Id.* ¶ 81.)  (When Johnson later, in January 2016, inquired why she was no longer invited, Martinez claimed that he "forgot" and it would be "too much" for her to travel.  (*Id.*))  Then, in April 2015, JWT also canceled the annual meeting for the Worldwide Communications/Public Relations Council, one of Johnson's initiatives, while allowing other programs spearheaded by different employees to go forward.  (*Id.* ¶ 84.)  That same month, Defendants informed Johnson that, due to budget constraints, they would send only her, and not her team, to London to receive an award.  (*Id.*)  Johnson alleges that she was "forced to plead" with employees at JWT's London office to sit with her at the award ceremony, as she collected the event's top prize.  (*Id.*)

On approximately May 20, 2015, Johnson met with Martinez to discuss his rape comments, and later the same day, talked to JWT's Chief Creative Director about Martinez's conduct.  (*Id.* ¶ 70.)  The Director replied that the comments were "awkward" but failed to act on the information.  (*Id.*)  The next day, Johnson met again with Agostini to address Martinez's comments about women and minorities and to stress that someone should "speak to Martinez immediately," and perhaps direct him to sensitivity training or other discussions with WPP's

---

[1]     When Martinez did invite Johnson to Executive Committee meetings, for example in March 2015, he failed to invite any women to dinner following the meeting, though he included some male employees who were not part of the Executive Committee.  (*Id.* ¶ 82.)  Male participants (but not Martinez specifically) "consistently interrupted" women presenters, though male presenters faced no interruptions.  (*Id.*)

lawyers.  (*Id.* ¶ 71.)  That same day, Johnson sent an email to Agostini to "[f]ollow[] up" on the conversation, urging Agostini to "bring in someone to help address this so [that Martinez] understands."  (*Id.* ¶ 72.)  Agostini replied later that day indicating that she "had a conversation with [Martinez]" and that she was "addressing" it.  (*Id.* ¶ 73.)  Again, in November 2015, Johnson broached the topic of "Martinez's erratic behavior" with Agostini.  (*Id.* ¶ 75.)

In October 2015, Martinez began assigning away duties that Johnson had performed for him, including ghostwriting articles, op-eds, and social media posts (which Martinez described as "thought leadership content") (*id.* ¶ 85), despite the fact that one article Johnson had penned in Martinez's name had previously been recognized as one of the most-read guest columns in 2015. (*Id.*)

Johnson alleges that Defendants failed to take any action after her repeated attempts to raise her concerns with them.  In mid-February 2016, for example, Johnson again followed up with Agostini to see if anyone had, in fact, addressed the issue with Martinez directly.  (*Id.* ¶ 74.) Agostini indicated that an in-house lawyer "was supposed to" but did not confirm that any intervention actually took place.  (*Id.*)  That same month, on February 12, Johnson met with JWT's Chief Financial Officer ("CFO") and stated that JWT was creating an environment that was hostile to its female employees.  (*Id.* ¶ 76.)  The CFO allegedly responded that Johnson should "accept the mistreatment" or "take action and do something about it."  (*Id.*)  And though other senior executives, including Agostini, allegedly witnessed some of Martinez's remarks about Jews and African Americans, they did nothing to address the behavior.  (*Id.* ¶ 77.)

Around February 19, 2016, Johnson and other employees received a questionnaire from JWT's CFO.  (*Id.* ¶ 86.)  The questionnaire asked participants, including Johnson, to certify by

February 26, 2016, that they were not aware of any illegal conduct at the company.  (*Id.*)
Johnson felt she could not do so, and she engaged an attorney.  (*Id.* ¶¶ 86-87.)

On February 22, Johnson's lawyer sent a letter informing Defendants that Johnson
believed she had been subjected to unlawful discrimination and retaliation.  (*Id.* ¶ 87.)
Defendants then placed Johnson on paid leave.  (*Id.*)  By letter dated February 25, Defendants
told Johnson that they "expect[ed] to complete [an] investigation" of the allegations by "next
week," at which point the paid leave of absence "w[ould] be over."  (*Id.* ¶ 88.)

As of the date of the operative complaint in this case, Johnson remains on paid leave and
"continues to work . . . from home."  (*Id.* ¶ 89.)  Martinez and JWT have allegedly been critical
of Johnson's work ethic, "accus[ing] her of not being available when they needed her and
impl[ying] that she is unreliable."  (*Id.*)  JWT management also "put on 'hold'" Johnson's efforts
to hire for an open position in her department and to restructure some personnel; she alleges she
had "previously received oral approval" for these projects.  (*Id.*)

Following the filing of the initial complaint in this matter, on March 10, 2016, Martinez,
through WPP, issued a statement that that "there is absolutely no truth to [plaintiff's] outlandish
allegations."  (*Id.* ¶ 91 (alteration in original).)  WPP also sent a memo to senior executives,
clients, and media outlets stating that the company had been investigating Johnson's allegations
and had "found nothing."  (*Id.* ¶ 93.)  JWT issued a press statement saying that "Martinez has
asserted that [Johnson's] allegations are false."  (*Id.*)  These statements continued following a
news story allegedly "confirm[ing]" some of Martinez's remarks.  (*Id.* ¶ 94.)

## II.   Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a
complaint must contain sufficient matter . . . 'to state a claim to relief that is plausible on its

face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550

U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Id.*  In assessing whether this standard has been met, courts take "all

factual allegations contained in the complaint" as true, *Bell Atl. Corp.*, 550 U.S. at 572, and

"draw all inferences in the light most favorable to the non-moving party[]," *In re NYSE*

*Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (citation omitted).

## III.    Discussion

Johnson alleges that JWT and WPP discriminated and retaliated against her on the basis

of her sex in violation of Title VII, and that all Defendants (that is, JWT, WPP, and Martinez)

discriminated and retaliated against her in violation of State Law and City Law.  She also alleges

retaliation by Defendants for opposition to discriminatory practices in violation of the EPA and

Section 1981.

The Court first addresses Johnson's sex discrimination claims.  It then turns to her

retaliation claims.[2]

---

[2]        JWT and WPP have jointly filed briefs in connection with their motion to dismiss,
while Martinez is separately represented.  The Court addresses Defendants' arguments in favor
of their respective motions to dismiss collectively where they overlap—as regards claims under
the EPA, Section 1981, State Law, and City Law—and identifies certain arguments with certain
Defendants where they diverge.  As regards Johnson's hostile work environment discrimination
claims, because the standard under State Law is the same as under Title VII, *see McCall v.
Genpak, LLC*, No. 13 Civ. 1947, 2015 WL 5730352, at *24 (S.D.N.Y. Sept. 30, 2015), and the
City Law standard is even more liberal, *see Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102, 109-10 (2d Cir. 2013), the Court further analyzes the facts supporting Johnson's
Title VII claim against JWT and WPP in tandem with the analogous State and City Law claims
against JWT, WPP, and Martinez.  *See Lopes v. Caffe Centrale LLC*, 548 F. Supp. 2d 47, 54
(S.D.N.Y. 2008) ("An individual supervisor cannot be held personally liable under Title VII.").

### A.    Hostile Work Environment Discrimination

Johnson argues that Defendants discriminated against her by creating and fostering a hostile work environment.  "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is *objectively* severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff *subjectively* perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (emphasis added) (internal alterations and quotation marks omitted) (quoting *Gregory v. Daly*, 243 F.3d 687, 691-92 (2d Cir. 2001)).  "Ultimately, to avoid dismissal under [Rule] 12(b)(6), a plaintiff need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse.'"  *Id.* (alteration in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

In considering Johnson's claims, the Court is mindful of the highly context-dependent nature of this analysis, which underpins the Second Circuit's "repeated[] caution[] against setting the bar too high" for workplace discrimination claims facing a 12(b)(6) motion to dismiss.  *Id.* (quoting *Terry*, 336 F.3d at 148).  Thus, while the Court looks to other decisions from courts in this District for guidance, the diversity of results in such cases confirms the need for individualized consideration.  *Compare Kaytor*, 609 F.3d at 550 (rejecting the district court's dismissal of a hostile work environment claim at the summary judgment stage where plaintiff alleged that her boss threatened to "choke" or "kill" her on several occasions, commented about women's bodies, and made sexualizing comments about the plaintiff over the course of a sixteen-month period), *with Goodwine v. City of N.Y.*, No. 15 Civ. 2868, 2016 WL 3017398, at

10

*8 (S.D.N.Y. May 23, 2016) (dismissing a plaintiff's claim of hostile work environment because, in the context of an eight-year stint, alleged demeaning comments, one act of threatened violence, and a functional demotion were best understood as "isolated acts" (quoting *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002))).

The Second Circuit has also emphasized that, in the context of employment discrimination cases, courts should evaluate the facts holistically rather than "view individual incidents in isolation" or in a "piecemeal fashion." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 176 (2d Cir. 2012) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 548 (2d Cir. 2010)); *cf. Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016) ("The district court erred when it failed to view [a plaintiff's] evidence as a whole and instead set aside each piece of evidence after deeming it insufficient . . . ."). This imperative is especially important in the context of a hostile work environment claim, which "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002) (quoting 42 U.S.C. § 2000e–5(e)(1)).[3] With this mandate in mind, the Court addresses each constituent element of Johnson's hostile work environment claim in turn.

### 1.   Objective Hostility

The first element of a claim, "[t]he objective hostility of a work environment[,] depends on the totality of the circumstances, viewed from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances including the social context in which

---

[3]     Defendants object to Johnson's hostile work environment claim, arguing, essentially, that the conduct she has alleged is not severe or pervasive enough to state a claim. (*See* Dkt. No. 65 at 3-4 (listing conduct); Dkt. No. 46 at 12-14.) To make their argument, Defendants tend to disaggregate the individual incidents underlying Johnson's claim. (*See* Dkt. No. 40 at 20; Dkt. No. 46 at 12-14; Dkt. No. 65 at 3-4.) The Court, however, declines to adopt a piecemeal approach to the facts Johnson has pleaded.

particular behavior occurs and is experienced by its target." *Redd*, 678 F.3d at 176 (internal alterations and quotation marks omitted) (quoting *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004)). The alleged conduct, viewed together, must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 175 (internal quotation marks omitted) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). "*[N]o single factor is required*," but courts may look for certain indicia, including "the *frequency* of the discriminatory conduct; its *severity*; whether it *is physically threatening or humiliating*, or a mere offensive utterance; and whether it *unreasonably interferes with an employee's work performance*." *Id.* (quoting *Harris*, 510 U.S. at 23).[4]

The Court begins by addressing the allegations that Martinez touched Johnson without her consent. The presence of any conduct that is "physically threatening or humiliating" may be especially important in determining whether a work environment is objectively hostile. *Id.* (quoting *Harris*, 510 U.S. at 23). This is because "even if overtly gender-based discriminatory conduct is merely episodic and not itself severe, the addition of 'physically threatening . . . behavior may cause 'offensive or boorish conduct' to cross the line into 'actionable sexual harassment.'" *Kaytor*, 609 F.3d at 547 (alteration in original) (quoting *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000)).

---

[4]      Defendants argue, in part, that Johnson has not alleged enough instances of discrimination to state a claim. But there is no "threshold" "magic number" of anecdotes required to support a hostile environment claim. *Rivera v. Rochester Genesee Regional Trans. Auth.*, 743 F.3d 11, 22 n.5 (2d Cir. 2012) (quoting *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 439 (2d Cir. 1999)); *see, e.g.*, *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) ("[A] single act can create a hostile work environment."). The Court thus considers whether, together, Johnson's allegations evince a pervasiveness or severity sufficient to state a claim.

Johnson alleges that Martinez touched her routinely: "He often rub[bed] her shoulders and stroke[d] her face."[5]  (Compl. ¶ 45.)  Johnson additionally pleads multiple specific instances of unwanted touching.  (*See id.* ¶¶ 45-48.)  These allegations of physical contact plausibly allege a pattern wherein Martinez asserted physical power over Johnson without her consent.  *See Redd*, 678 F.3d at 177 (2d Cir. 2012) ("[W]hen the physical contact surpasses what (if it were consensual) might be expected between friendly coworkers . . . it becomes increasingly difficult to write the conduct off as a pedestrian annoyance." (second alteration in original) (quoting *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006))).  These repeated instances of nonconsensual contact, especially when coupled with offensive and explicit comments, inform the Court's understanding of the additional allegations against Martinez discussed below.

Johnson also alleges numerous potentially threatening comments by Martinez.  In May 2015, for example, following an exchange with Johnson about his discussing rape at a meeting, Martinez approached Johnson at her desk and, in front of her colleagues in their shared open office, instructed her to come with him so that he could "rape [her]" in the bathroom.  (Compl. ¶ 43.)  He then grabbed Johnson around the neck and started to laugh.  (*Id.*)  That same day, Martinez interrupted a meeting with multiple female employees, including Johnson, to ask Johnson which female staff member he could rape.  (*Id.*)  On a separate occasion, Martinez

---

[5]     Defendants argue that Johnson improperly characterizes some of Martinez's behavior as "routine[]" or "incessant."  (Dkt. No. 67 at 6-7.)  The Court finds that these factual allegations are not strictly necessary for Johnson to meet her burden at the motion-to-dismiss stage; she pleads enough, as discussed above, and "does not need to recount each and every instance in order to establish pervasiveness at summary judgment, much less to survive a motion to dismiss."  *Parrott v. Krasicky*, No. 12 Civ. 820, 2013 WL 3338570, at *4 n.5 (D. Conn. July 2, 2013).  In any event, the Second Circuit, rejecting a district court's discounting of similar allegations as "inappropriately assum[ing] the role of factfinder," has approved of similar allegations of repeated or routine conduct, since "testimony that in fact there were many [similar] instances would be admissible at trial."  *Kaytor*, 609 F.3d at 550.

ushered colleagues out of his office but held Johnson behind, saying, "let's go talk about sex now

. . . I am going to close the door." (*Id.* ¶ 49.)  Johnson also learned that in spring 2015 Martinez

had told another employee that a certain female senior global executive needed to be "hogtied"

and "raped into submission." [6]  (Compl. ¶ 44.)  In the course of a business meeting, Martinez

called a female JWT Director "young, willing, and ready." (*Id.* ¶ 52.)

Johnson further alleges that Martinez made myriad other comments about rape and sex.

Defendants argue that many such comments suggest merely a lack of civility, and, in any event,

were not gender-motivated because some of the comments were made in mixed company (and

therefore not specifically directed at women). (*See* Dkt. No. 40 at 20-22; Dkt. No. 46 at 12-14.)

But Martinez's multiple comments alluding to his raping Johnson and other female employees

color and make relevant his other, more generalized invocations of rape and sex, even if those

comments were made in the presence of men or were not exclusively targeted at women.

(Compl. ¶¶ 43, 49.)  That is to say, these other remarks did not occur "in a vacuum," *Ellison v.*

*Brady*, 924 F.2d 872, 879 (9th Cir. 1991): On numerous occasions, Martinez used similar

language to threaten female employees, including Johnson.  The Court is thus especially mindful

that it should consider *all* of Martinez's comments with "a full appreciation of the social setting

or the underlying threat of violence"—in part a recognition that, as compared to men, "women

are disproportionately victims of rape and sexual assault." *Id.* (citing United States Department

---

[6]     Contrary to Defendants' arguments that "second-hand statements[s]" or
statements about "another woman" do not create a hostile work environment (Dkt. No. 65 at 4
n.1), the Second Circuit has held that a court may consider comments about other women that
may not have been "directed" at a plaintiff, *Kaytor*, 609 F.3d at 548, as well as remarks that a
plaintiff learns "second-hand," *Ward v. Shaddock*, No. 14 Civ. 7660, 2016 WL 4371752, at *8
(S.D.N.Y. Aug. 11, 2016) (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 71
(2d Cir. 2000)).  The Court thus considers these statements, together with Johnson's other
allegations, in order to determine whether Plaintiff pleads a hostile work environment.

of Justice, Office of Justice Programs, Bureau of Justice Statistics, Sourcebook of Criminal

Justice Statistics 1988 at 299, tbl. 3.19 (1989)).

Defendants argue that still other remarks allegedly made by Martinez should be

discounted because they are not overtly or intentionally "sexual."  But every comment

underpinning a hostile work environment claim need not be "sexual in nature."  *Kaytor*, 609 F.3d

at 548.  Certain of Martinez's comments, viewed in the context of his physically intimidating

behavior and repeated sexually explicit and demeaning statements, suggest a workplace cut

through with hostility.  After Johnson's pregnancy, for example, Martinez made a "snide

remark" about her eating at a work event, implying that she should eat less.  (Compl. ¶ 53.)  He

made similarly derogatory comments about other women's bodies.  (*Id.* ¶ 54.)  These comments,

though perhaps not obviously sexual, are, considered in context, potentially sexual or sexually

hostile in nature and implication.

Considering the alleged conduct in context, Johnson has pleaded enough to support a

plausible inference that an objectively hostile work environment existed.  "The question of

whether a work environment is *sufficiently* hostile to violate Title VII is one of fact," and the

Court thus declines to decide it at the motion-to-dismiss stage.  *Holtz v. Rockefeller & Co., Inc.*,

258 F.3d 62, 75 (2d Cir. 2001) (emphasis added).  Even "[s]ummary judgment should be used

'sparingly,'" *Kaytor*, 609 F.3d at 548 (alteration in original) (quoting *Distasio v. Perkin Elmer

Corp.*, 157 F.3d 55, 61 (2d Cir. 1998)); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d

597, 605 (2d Cir. 2006) ("[T]he line between boorish and inappropriate behavior and actionable

sexual harassment . . . is admittedly indistinct, [and] its haziness counsels against summary

judgment." (internal citation omitted) (quoting *Holtz*, 258 F.3d at 75)), as the interpretation of

any ambiguous conduct is properly "an issue for the jury," *Gallagher v. Delaney*, 139 F.3d 338, 347 (2d Cir. 1998).

### 2.      Subjective Hostility

The second element of a hostile work environment claim is the "subjective" hostility of a work environment.  "The effect on the employee's psychological well-being is . . . relevant to determining whether the plaintiff actually found the environment abusive," but such a showing is not "*required*."  *Redd*, 678 F.3d at 175 (quoting *Harris*, 510 U.S. at 23).  Defendants do not appear to contest the effect of the alleged conduct on Johnson herself.  Indeed, Johnson claims that she was "intimidate[d] and humiliate[d]" by Martinez's treatment of her.  (Compl. ¶ 47.)  And her further reports of flagging Martinez's conduct for superiors and other colleagues evince a degree of concern and agitation about the conduct to satisfy this prong.  (*Id.* ¶¶ 67-69.)

### 3.      Causation

The third element, whether the hostile environment is "because of the plaintiff's sex," requires some analysis as to the nature and underlying cause of the hostility the plaintiff has pleaded.  As an initial matter, Johnson alleges a fair number of interactions and comments that, on their face, were sex-based, such as commenting on women's bodies, including Johnson's, and making sexual remarks about women (including that a female employee is "young, willing, and ready").  (*See, e.g.*, Compl. ¶¶ 43-44, 52-54.)

Moreover, in the context of Johnson's collective allegations, Martinez's repeated references to sex and rape—both coupled with and divorced from physical or physically intimidating conduct—reveal a gendered component of the conduct, sometimes rising to the level of explicit gender animus.  In threatening to "rape" Johnson (even jokingly) and asking

which other female employees he could rape, Martinez asserted power over Johnson in an explicitly sexualized and gendered form.[7]

But it is not just Martinez's overtly sexual behavior that is plausibly viewed as undertaken because of Johnson's sex.  The Second Circuit has established that "incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination—for example, where the same individual is accused of multiple acts of harassment, some overtly sexual and some not." *Pucino v. Verizon Commc'ns, Inc.*, 618 F.3d 112, 118–19 (2d Cir. 2010) (quoting *Alfano*, 294 F.3d at 375).[8]  So while some incidents may not "directly amount" to sex discrimination "when considered alone in isolation, an inference that such conduct was gender-based could be drawn" given evidence of other sex-based conduct.  *Id.* at 119.  To that end, alleging some "overtly sexual comments" can be sufficient for a court to conclude that other "facially gender-neutral threats . . . were, in fact, 'because of' . . . sex." *Kaytor*, 609 F.3d at 549.  The Court thus takes into account Martinez's repeatedly touching Johnson (including grabbing her by the neck and shoving her, as well as taking her apple from her hand, taking a bite, and returning it) as part of a broader effort to intimidate her physically because of her sex.[9]

---

[7]    That Martinez apparently found his actions humorous, at one point laughing while he touched Johnson, does not, as JWT and WPP argue, belie "any claim that such conduct was 'threatening.'"  (Dkt. No. 67 at 7 (quoting Dkt. No. 30 at 13-14).)  To the contrary, drawing all inferences in Johnson's favor, it is plausible to infer that Martinez's cavalier attitude further undermined Johnson's physical autonomy.

[8]    Rejecting a district court's dismissal on summary judgment of a Title VII claim, the Second Circuit confirmed that "[s]o long as there is some evidentiary basis for inferring that facially sex-neutral incidents were motivated by the plaintiff's gender, the ultimate question of whether such abuse was 'because of' the plaintiff's gender is a question of fact for the factfinder." *Kaytor*, 609 F.3d at 548 (internal citation omitted) (quoting 42 U.S.C. § 2000e-2(a)(1)).

[9]    Whether or not Martinez's touching was *sexual* in Defendants' view (*see* Dkt. No. 67 at 7-8; Dkt. No. 40 at 4), does not impact the sex-based nature of the allegations.  In fact, the

Through both his words and his actions, even if not overtly sexual, Martinez allegedly

exhibited hostility toward the idea of women exercising power in the workplace.  For example,

Martinez's references to Johnson's being "bossy" can be understood not as a sex-neutral insult

but rather as invoking a double standard for men's and women's leadership in the workplace.

*See, e.g.*, Cathleen Clerkin et al., *Bossy: What's Gender Got to Do with It?*, Ctr. for Creative

Leadership 5 (2015) ("[W]omen were twice as likely [than men] to be branded bossy in the

workplace.").  The view of female bosses as "bossy" is a feature of the "glass ceiling problem[],"

namely, that given the close association of 'managers' and 'leaders' with masculinity, subjects

tend to dislike women whom they rate highly as managers and leaders because of 'role

incongruity'—the sense that it is incongruous for women to successfully perform masculine roles

as opposed to feminine roles."  *Burns v. Johnson*, 829 F.3d 1, 13 n.13 (1st Cir. 2016) (quoting

Joan C. Williams & Nancy Segal, *Beyond the Maternal Wall: Relief for Family Caregivers Who

are Discriminated Against on the Job*, 26 Harv. Women's L.J. 77, 93 (2003)).  This brand of

stereotyping has been deemed impermissible under Title VII.  *See Price Waterhouse v. Hopkins*,

490 U.S. 228, 251 (1989) ("[W]e are beyond the day when an employer could evaluate

employees by assuming or insisting that they matched the stereotype associated with their

group.").  When considered alongside his repeatedly calling Johnson "bossy," Martinez's

conduct—including his physical touching and his lewd comments—can be read as a "power

play[]," some mix of "sex-based animus" and "misdirected sexual desire," *Smith v. Sheahan*, 189

F.3d 529, 533 (7th Cir. 1999), that aimed to undermine Johnson's status at JWT because of her

sex.

---

Second Circuit has held that threatening choking—that is, touching an employee's neck, as
here—could support a claim of sex-based discrimination.  *Kaytor*, 609 F.3d at 549.

The totality of Martinez's alleged conduct, both overtly sex-based or sexual and not, can be read as a campaign to assert power over Johnson—to sexualize her, to demean her, to professionally diminish her, and to deprive her of bodily security—because of her sex. Johnson's Title VII hostile work environment claim therefore survives the motion to dismiss.

### 4.      State and City Law

Because Johnson has plausibly pleaded a claim under Title VII, she has also done so under State Law, which employs the same standard and analysis.  *McCall*, 2015 WL 5730352, at *24 ("A hostile work environment claim is evaluated under the same standard under Title VII as under the NYSHRL . . . ."); *see also Massie v. Metro. Museum of Art*, No. 11 Civ. 9549, 2015 WL 3833839, at *6 (S.D.N.Y. June 22, 2015) (explaining that Title VII, NYSHRL, and Section 1981 hostile work environment claims entail the same analysis).

Johnson has also satisfied the less stringent requirements of City Law.  The NYCHRL requires a plaintiff to show only "the existence of differential treatment" because of gender—that is, "that she has been treated less well than other employees because of her gender."  *Mihalik*, 715 F.3d at 110 (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38-39 (N.Y. App. Div. 1st Dep't 2009)).  "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages."[10]  *Id.*

---

[10]      Moreover, under City Law, Defendants' arguments that Martinez's conduct was not serious enough to constitute a hostile work environment are not properly considered on a Rule 12(b)(6) motion.  Rather, evidence that any discriminatory conduct was "a petty[,] slight or trivial inconvenience constitutes an affirmative defense, which should be raised in a defendants' answer, and does not lend itself to a pre-answer motion to dismiss."  *Kaplan v. N.Y.C. Dep't of Health & Mental Hygiene*, 38 N.Y.S.3d 563, 565-66 (N.Y. App. Div. 2d Dep't 2016) (internal citation omitted).

In addition to pleading sufficient facts to support a hostile work environment claim,

Johnson has also adequately alleged individual liability on Martinez's part under State and City

Law.  "[I]ndividual defendants may be sued in their personal capacities," *Lopes*, 548 F. Supp. at

54, where they "aid, abet, incite, compel, or coerce" an action prohibited by State and City Law,

N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8-107(6).  Because the overwhelming majority

of the conduct described above was "incite[d]" by Martinez personally, the allegations support a

finding that he "actually participate[d] in the conduct giving rise to a discrimination claim," thus

satisfying the standard for individual liability.  *Feingold*, 366 F.3d at 157 (quoting *Tomka v.

Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)).  Martinez's argument that he cannot be held

liable for "aiding and abetting" his own conduct has been rejected by numerous courts in this

Circuit.  *See Geras v. Hempstead Union Free Sch. Dist.*, 149 F. Supp. 3d 300, 338 (E.D.N.Y.

2015) (collecting cases).  All that is required for individual liability to flow is that the corporate

employer have carried out a predicate act of unlawful discrimination, which Johnson has

adequately pleaded here (as detailed above).  *See Nicholson v. Staffing Auth.*, No. 10 Civ. 2332,

2011 WL 344101, at *3-4 (S.D.N.Y. Feb. 1, 2011).

## B.     Retaliation

In addition to her claim of hostile work environment, Johnson also alleges that JWT and

WPP retaliated against her in violation of Title VII and that all Defendants did so in violation of

the Equal Pay Act (by retaliating against her for opposing pay discrimination), Section 1981 (by

retaliating against her for opposing race discrimination), State Law, and City Law.[11]

---

[11]     As above, the Court considers claims against JWT and WPP and Martinez in tandem, as the standard under Title VII, under which Johnson has brought a retaliation claim only against JWT and WPP, mirrors those of the other statutes, under which Johnson has brought retaliation claims against all Defendants.  The Court identifies alleged retaliation carried out by Martinez or JWT and WPP alone where Johnson has done so in her complaint.

Specifically, Johnson alleges that after she reported to Martinez—as well as to JWT and WPP leadership—conduct she believed to be discriminatory, she suffered adverse employment consequences, including a reduction of pay (in the form of a diminished bonus), reduced responsibilities, and a hostile work environment.  The retaliation culminated, she argues, after she retained counsel, sent Defendants a letter stating that she believed she had been the subject of discrimination and retaliation, and filed this lawsuit.  She was then placed on paid leave; Defendants made disparaging comments about her in the press; and previously planned expansions to her team were canceled.

To establish a presumption of retaliation at the initial stage of litigation, a plaintiff must present evidence that shows "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).  The governing standard is an objective one: "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  The same standard applies for retaliation claims under Title VII, the Equal Pay Act, and Section 1981.  *Hicks*, 593 F.3d at 163.  This standard also applies under State Law, and City Law imposes an even less rigorous standard.  *See, e.g.*, *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012) (State Law); *Williams v. New York City Hous. Auth.*, 61 A.D.3d 62, 70-71 (N.Y. App. Div. 2009) (City Law).

21

Defendants challenge the sufficiency of Johnson's retaliation claims on several grounds, including: (1) that some of the protected activity she describes (including complaints to Martinez as well as other JWT and WPP officials about anti-Semitic,[12] racist, and sexist comments and conduct) may have predated or not have been causally related to some of the purported retaliation (such as Johnson's reduced bonus, diminished work responsibilities, and the alleged retaliatory hostile work environment); and (2) that Johnson registered some complaints as part of her regular work duties—as a high-level executive with employees working below her—which would not constitute protected activity.[13]

As an initial matter, Johnson's second amended complaint alleges retaliation in connection with the lead-up to and filing of this lawsuit, separate from the underlying conduct over the preceding fifteen-month period she spent reporting to Martinez.  Johnson retained a lawyer and sent a letter to her employer in February 2016, stating that she believed she had been subjected to discrimination and retaliation.  (Compl. ¶ 87.)  And then, in March 2016, she filed this case with claims under Section 1981 and the EPA, later amending it to add hostile work environment and retaliation claims under Title VII.  The anti-retaliation clause of Title VII

---

[12]    Anti-Semitism qualifies as race discrimination for the purpose of Section 1981. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987).

[13]    The Second Circuit has made clear that "merely to convey others' complaints of discrimination is not to oppose practices made unlawful by Title VII." *Littlejohn*, 795 F.3d at 318.  "But if an employee—even one whose job responsibilities involve investigating complaints of discrimination—actively 'support[s]' other employees in asserting their Title VII rights or personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer, that employee has engaged in a protected activity under § 704(a)'s opposition clause." *Littlejohn*, 795 F.3d at 318 (alterations in original) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)).  In any event, some of the protected activity Johnson alleges, including Johnson's questioning whether bonus distribution was unfair and complaining of unwanted touching, involved reporting apparently illegal discrimination against Johnson herself, and therefore cannot properly be understood to be within her "job duties" or primarily representing the interests or complaints of others.

protects an individual who has "opposed" discrimination prohibited by the statute or

"participated in any manner" in a Title VII proceeding.  42 U.S.C. § 2000e-3(a); *see also Jute*,

420 F.3d at 174.  The same is true for retaliation under Section 1981, *see Spencer v. Int'l*

*Shoppes, Inc.*, 902 F. Supp. 2d 287, 294 (E.D.N.Y. 2012), and the EPA, *see Kassman v. KPMG*

*LLP*, 925 F. Supp. 2d 453, 472 (S.D.N.Y. 2013) (citing *Mullins v. City of N.Y.*, 626 F.3d 47, 53

(2d Cir. 2010)).  Johnson thus engaged in protected activity by having her lawyer send

Defendants a letter alleging discrimination and filing this lawsuit.[14]  *See Jaeger v. N. Babylon*

*Union Free Sch. Dist.*, No. 15 Civ. 5452, 2016 WL 3198276, at *14 (E.D.N.Y. June 7, 2016);

*see also Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006).

Johnson's actions in connection with this case further meet the second prong: Defendants

had knowledge of Johnson's letter stating she had been subjected to discrimination when they

received it and of the filing of the suit when they were served with their summonses.

Johnson also alleges that she suffered adverse consequences for engaging in these

protected activities.  "A plaintiff sustains an adverse employment action if he or she endures a

'materially adverse change' in the terms and conditions of employment."  *Galabya v. N.Y.C. Bd.*

*of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citing *Richardson*, 180 F.3d at 446).  "To be

'materially adverse' a change in working conditions must be 'more disruptive than a mere

inconvenience or an alteration of job responsibilities.'"  *Id.* (quoting *Crady v. Liberty Nat'l Bank*

*& Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993)).  For instance, "[a] materially adverse change

might be indicated by a termination of employment, a demotion evidenced by a decrease in wage

---

[14]      A retaliation claim is "not dependent on the merits of the underlying
discrimination complaint."  *Eichler v. Am. Int'l Grp., Inc.*, No. 05 Civ. 5167, 2007 WL 963279,
at *15 (S.D.N.Y. Mar. 30, 2007) (quoting *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d
Cir. 1986)).  Thus, the fate of Johnson's retaliation claims does not hinge on the merits of her
Title VII hostile work environment claims.

or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . ." *Id.* (alteration in original) (quoting *Crady*, 993 F.2d at 136).

Johnson claims that Defendants collectively placed her on paid leave following a letter from her lawyer.[15]  (Compl. ¶ 87.)  The Second Circuit has made clear that placing an employee on "suspension with pay may sometimes rise to the level of an adverse employment action." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012) (citing *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006)).  The key question is whether the administrative leave "changed the terms and conditions of employment" or was coupled with other actions—something more—that, together with administrative leave, did so.  *Id.* at 150-51 (quoting *Joseph*, 465 F.3d at 92 n.1).

Johnson alleges that her placement on paid leave was accompanied by other actions that, collectively, altered the conditions of her employment.  After promising and failing to conclude an internal investigation within a week so as to allow Johnson to return to work, JWT management further put the brakes on Johnson's future at the company by allegedly placing development in her department on "hold."  (Compl. ¶ 89.)  Johnson also alleges that, since the filing of the initial complaint in this case, JWT and WPP and Martinez have publicly criticized her work ethic, "accus[ing] her of not being available when they needed her and impl[ying] that

---

[15]     JWT and WPP argue that Johnson's being placed on paid leave is not a materially adverse action primarily because "Johnson herself, through her lawyers, requested" it. (Dkt. No. 40 at 8.)  But JWT acknowledges that its rejoinder relies on a representation of fact that is not contained in Johnson's complaint.  (*Id.*)  When considering a 12(b)(6) motion, the Court must consider only the allegations contained in the Complaint and must, for the motion's purposes, take the allegations as true.  *See Bell Atl. Corp.*, 550 U.S. at 572.  The parties have also notified the Court in a series of letters and a letter motion that Johnson has returned to work, though Johnson represents that she continues to face retaliation back on the job.  (*See* Dkt. No. 68; Dkt. No. 69; Dkt. No. 70; Dkt. No. 71.)  But, for the purposes of the instant 12(b)(6) motion, the Court is constrained to the facts as alleged "within the four corners of [the] complaint."  *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998).

she is unreliable," and made multiple additional statements implying that she is not credible or truthful.  (*Id.* ¶¶ 89, 91, 93, 94.)  For instance, Martinez, through JWT and WPP, released a statement calling Johnson's complaints "outlandish" and implying that she has lied.  (*Id.* ¶ 91.) Substantially similar actions, including prolonged failure to investigate complaints and calling the plaintiff a "liar," have been found to be materially adverse actions in connection with retaliation claims.  *See DeLisi v. Nat'l Assoc. of Prof'l Women Inc.*, 48 F. Supp. 3d 492, 496 (E.D.N.Y. 2014).  Defendants' conduct, considered as a whole, meets the "objective" standard, as the "employment consequences of a negative nature" resulting from making a complaint could chill other employees from speaking up.  *Cox v. Onondaga Cty. Sheriff's Dep't*, 760 F.3d 139, 147 (2d Cir. 2014).

Fourth, Johnson has pleaded a sufficient "causal connection" between her protected activity and the alleged retaliatory acts.  "A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action."  *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).  Johnson alleges that each of the actions—including her placement on leave, the halting of her team's development, and the smearing statements in the press—immediately followed her lawyer's letter and the filing of the initial complaint in this action.  She thus satisfies the relatively loose causation requirements at the 12(b)(6) stage, as the Court recognizes that the motivation behind each alleged retaliatory action is a question of fact.  *See id.*

In addition to conduct related to the instant lawsuit, Johnson catalogues other instances of

protected activity to support her claims under Title VII,[16] the EPA,[17] and Section 1981.[18]  She

connects these to other instances of retaliation, including discrete actions on Martinez's part

(such as reducing her bonus in spring 2015, and thereafter assigning away or otherwise reducing

---

[16]     Johnson alleges that she raised the issue of potentially gender-biased bonuses in April or May 2015 with Martinez directly.  (Compl. ¶ 79.)  She also broached the topic of Martinez's comments—about rape, sex, women, racial minorities, and Jews—with Martinez himself, as well as Agostini and JWT's Chief Creative Director in May 2015.  (*Id.* ¶¶ 41, 68-71.)  Defendants argue that at least some of Johnson's complaints were not "protected activity" within the meaning of the statute because they relate to her work duties.  Johnson was a manager and, as such, Defendants argue that it was within her job duties to report any alleged wrongdoing to higher-ups at the company.  (*See, e.g.*, Dkt. No. 40 at 9-10 & n 11.)  *Littlejohn*, 795 F.3d at 318.  But Defendants' objections on this score are unavailing, since, as discussed above, some of the complaints involved discrimination against Johnson herself, such as reporting Martinez's touching in mid-March 2015.  (Compl. ¶ 68).

[17]     To state a retaliation claim under the EPA, a plaintiff must show that she raised the issue of potentially "gender-related" disparate pay for substantially similar work, but she need not have cited the EPA or accused her employer of illicit conduct.  *See Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D 557, 564 (S.D.N.Y. 2013).  Johnson alleges that she raised the issue of equal pay with Martinez in April or May 2015.  (Compl. ¶ 80.)  Specifically, Johnson questioned whether "all of the men" who reported to Martinez had, like her, received a pay cut in the form of reduced bonus.  (*Id.*)  JWT and WPP characterize Johnson's complaints as only about her bonus and not about equal pay, *per se*.  But, drawing all inferences in Johnson's favor, the Court concludes that her specific reference to whether her male counterparts experienced a similar slash to their bonuses is enough.

[18]     Johnson alleges that she repeatedly complained of Martinez's race-based "offensive conduct," including in April 2015 (Compl. ¶ 70) and on multiple occasions in May 2015 (*id.* ¶¶ 69, 71, 72).  Defendants object that Johnson's reporting efforts were part of her job and therefore did not constitute protected activity.  As discussed above, the Second Circuit has made clear that reporting discrimination against others is protected where the individual "personally 'complain[s]' or is 'critical' about the 'discriminatory employment practices' of her employer."  *See Littlejohn*, 795 F.3d at 318 (quoting *Sumner*, 899 F.2d at 209).  Taken in the context of the Johnson's repeated efforts to call to Defendants' attention conduct that she believed to be unlawful (culminating in the filing of this lawsuit), these allegations are sufficient to plausibly allege that her complaints of race-based discrimination reflected her own concerns about Martinez's conduct and were sufficiently oppositional to warrant protection from retaliation.  *Id.* ("[C]ommunicating to the employer the manager's own 'belief that the employer has engaged in . . . a form of employment discrimination,' which 'virtually always constitutes' opposition notwithstanding the employee's underlying job responsibilities."  (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cty.*, 555 U.S. 271, 276 (2009))).  Whether fact discovery would bear out such an inference is a question for a later day.

her responsibilities, disinviting her from Executive Committee meetings, and canceling her team's planned travel (Compl. ¶¶ 78-84)), and inaction on JWT's and WPP's parts, as well as their abandoning aspects of Johnson's initiatives (*id.* ¶ 84) and their alleged fostering of a retaliatory hostile work environment (the details of which are discussed above).  The relatively short lag time between the alleged complaints (beginning in March 2015) and various retaliatory actions (also commencing around March 2015) is sufficient to meet the liberal standard for retaliatory purpose at the motion-to-dismiss stage.  *See Vega*, 801 F.3d at 90, 92 (finding a few-month gap between the protected activity and the alleged retaliation to be sufficient to infer retaliatory purpose at the motion-to-dismiss stage).

Considering together Defendants' alleged retaliation before Johnson took the first steps toward initiating this lawsuit, in combination with Johnson's protected conduct in preparing for and filing the instant case, Johnson has pleaded enough to survive the 12(b)(6) motions.  The further development of Johnson's retaliation claims is appropriate under the Second Circuit's direction not to dismiss such claims too early.  *See Vega*, 801 F.3d at 90; *see also Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) (declining to "draw[] a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship" for the purposes of retaliation claims).

As above, Johnson's State and City law claims also survive.  State law is coextensive with the federal statutes under which Johnson has stated a claim.  *E.g.*, *Malena*, 886 F. Supp. 2d at 361.  She therefore satisfies the requirements of State Law for the reasons described above.  Johnson additionally meets the relaxed standard of the NYCHRL, under which a plaintiff can sustain a retaliation claim by showing merely that the employer did something that would be

"reasonably likely to deter a person from engaging in protected activity." *E.g.*, *Williams*, 61 A.D.3d at 70-71.

## IV.    Conclusion

For the foregoing reasons, Defendants' motions to dismiss are DENIED.  The Clerk of Court is directed to close the motions at Docket Number 39, Docket Number 45, and Docket Number 68.

Defendants shall file their answers to the complaint on or before January 3, 2017.

The stay of discovery is also hereby lifted.  (*See* Dkt. No. 63 at 12.)  Counsel for the parties are directed to submit a proposed case management plan by December 20, 2016, and to appear for a conference with the Court on December 22, 2016, at 3:00 p.m.  Counsel should be prepared to address their case management plan, as well as Johnson's proposed motion for a preliminary injunction.  (*See* Dkt. No. 68.)


SO ORDERED.


Dated: December 13, 2016
       New York, New York


_____
           J. PAUL OETKEN
        United States District Judge